Case 13-2004, 13-2005, and 13-2006, City of Detroit v. Comcast of Detroit et al. Oral argument, 15 minutes for the plaintiff, 15 minutes for the intervener, 30 minutes for the defendant. Ms. Walker for the defendant, appellant. Good morning. I guess before we get started, we did receive the City of Detroit's supplemental brief, which I think helps clarify issues that City of Detroit now asks for a straight affirmance of the judgment, and the issues that they raise, they term it a cross-appeal, but it's actually an alternative basis to affirm. They say we only need to get if we don't affirm the judgment below. I mean, I don't really see a cross-appeal here. I mean, if you're entitled to complete relief, if you affirm, you don't have to cross-appeal anyway. But anyway, I wanted to let you know that we do have that supplemental brief. We granted its filing. I think it helps focus the issues here, and we'll start from there. Ms. Walker, you may proceed. Thank you. Good morning. May it please the Court. Helgi Walker for appellant. Comcast, I've reserved 10 minutes of my 30 minutes for rebuttal with the Court's permission. In the statute at issue in this case, the Michigan legislature sought to improve the fairness and efficiency of the cable franchise process, just as Congress and the FCC envisioned the states would do. Comcast pursued a new uniform franchise under that statute and undisputedly complied with all of the statute's requirements. The Detroit City Council, quote, approved the uniform franchise for Comcast in an official binding resolution, and the city subsequently sought to enforce that franchise at the state PUC as, quote, approved and fully effective under the act. That's not quite correct. I'm sorry. You submitted to the city the uniform franchise form that's required by the Michigan statute, but that form has a blank as to the fee for PEG access. Is that correct? You left that blank. We left the third blank blank, but we filled that in with a zero. Zero, okay. So you submitted the standardized form with zero fee for PEG. The city agreed with the standard contract. However, they inserted 2% into that blank where you had zero. So they require 2%. You want 0%. Your interpretation of the Michigan statute is that because you submitted the form, I guess, first, that the city has to accept zero for fee as opposed to 2%, and therefore you have a contract for zero PEG fee. Is that your argument? No, Your Honor. Our argument is that there was admittedly a dispute between Comcast and the city over the applicability of the 2% PEG fee under state law. They're demanding a 2% fee, and that's allowed by statute, is it not? Your Honor, it's actually- Up to 2%? No, Your Honor. What the statute says is that if there is an existing franchise on the effective date of this act, then it's the franchise fee that applied in that incumbent provider's prior existing franchise. And in this particular case, that was zero. The Detroit City Council tried to get around that statutory language by saying, well, it's actually the date that we, the city council, take action, March 16th. And we look, and there's no incumbent provider's franchise on this date because Comcast's original franchise had expired on February 28th. But this dispute is actually on the merits of state law, frivolous, because the act says on the effective date of this act. I thought you started out by saying this is a new agreement, a new franchise, because the old one- It is. It is. I thought that's how you started out this. If it's new, that PEG fee is negotiable, is it not, between the parties? Your Honor, it's not. The whole point of the Michigan Act was to provide the uniform term- The whole point is to allow Comcast to have zero and to have the franchise or have to accept zero as the fee? Your Honor, whether the 2% applies or not is a question under the act that should have gone to the state PUC, and initially the city took it there, and we were happy to work that out there. Is there an administrative failure to exhaust administrative remedies issue in the appeal? Because I didn't think there was. No, Your Honor. The point is that the state law is- That this is not a question that's really before this court. The question that's before this court is whether Comcast has a franchise, and by operation of the Michigan Act, we do, because the plain language of that statute and the Michigan rule is that statutes must be taken as written, is that a uniform franchise agreement, if it's complete when it's submitted, is approved. If it's zero, they do not agree with the zero. There's no meeting of the lines traditionally under contract principles, and you're talking a lot of money, I think about $2 million a year or something like this, and so it is a material term in the contract that is not agreed to by both parties, so it's hard for me to say how you have a contract, and the only way you get there is to say the Michigan legislature requires the franchise or to accept whatever fee, zero to two percent, the cable company is willing to pay, and it's hard to believe the Michigan legislature would grant that sort of discretion to the cable company. Yes, whatever they want to pay for a fee, they have to accept. That's not just hard to believe. That's absurd. I'm sorry, you've got your question. No, I want her to answer your question because that's what I was wanting to know. Two points, if I might. Common law contract principles are irrelevant in this dispute. The city spends pages and pages on that in their brief. The Michigan legislature had every right to decide that franchises in its state should be uniform and should be easy to get. That was the point of this pro-competitive reform. Doesn't the standard form have a blank as to the PEG fee? It does. Doesn't that show that that is subject to negotiation between the parties, and when the legislature says that they shall approve it within 30 days, and if they don't act, it's deemed approved, doesn't it presuppose that there is an agreement between the two parties as to what to put in that blank as to the PEG fee? No, Your Honor, because the third blank did not apply here. The negotiation that the city can engage in only applies when there is no existing franchise on the date of this act, and in this case there was. You just said that this was a new contract, and if it's new, that means that there's not one existing. But you're at renewal, and isn't the PEG an essential part of this contract? On January 1, 2007, when the Michigan Act took effect, Comcast still had its 1985 franchise agreement. That agreement provided zero PEG fee payment to the city. The point of the Michigan Act, if I could just step back. The agreement expired, had it not? No, Your Honor, it had not. It was still in effect? On January 1, 2007, the date the Michigan Act took effect was not yet expired. And that's what the act says. Not the date that the form was submitted, right? No, Your Honor. The form was submitted after the franchise had expired? So if I could step back for just a moment. No, is that right? The date the standard form franchising agreement was submitted by Comcast, the previous existing franchise agreement had expired? No, Your Honor. No? Our 1985 franchise expired on February 28. We submitted our form on February 27. What the statute says is that if there is an existing franchise agreement on the effective date of the fact, which was January 1, we look to see what the PEG fee was in that existing contract, and that's what applies to everybody going forward, which makes sense, Your Honor, because what Section 5 of the Michigan Act did was to hit a reset button and to say these are going to be the terms for franchises statewide, and we don't want anybody to have a higher burden than anybody else as a video service provider, because that can create competitive disadvantages. So the act said if there is an existing PEG fee, that will be it for everybody going forward. But you said that there was no existing PEG fee in your contract, and the Michigan Attorney General fundamentally disagrees with you. Why should we give credence to his interpretation rather than the interpretation that you as a commercial vendor is offering? I didn't mean to. The PEG fee in our particular case was zero in the prior franchise, but that, by operation of law, carried over to the new uniform franchise. But this is a dispute that the Michigan Act provides for it. There is a dispute between the video service provider and the city over any term of the contract. That's to be resolved at the PEC, and that's what should have happened here. Why didn't you raise that issue in your appeal? You're the appellant. I don't see a failure-to-exhaust administrative revenues issue in this case, and if there is, I'd like to know about it. That's a state law question that we didn't bring to this court. We were sued, Your Honor, for supposedly having no franchise at all. It's not a defense to the federal case. It's federal jurisdiction here because you have federal issues, so I would assume that state issues are pendant. Well, there was no collateral estoppel effect of what the city had done, but I think we're getting sidetracked by the question that should have been litigated at the PEC, which we were happy to do. After the city dropped that proceeding, they then tried to turn around and take down the entire Michigan Act, and there's nothing about the Act, getting back to the actual federal questions, that is preempted by federal law. Michigan's pro-competitive reform They now say that the Michigan Act is consistent with federal law, that the district court got it right. As interpreted. Michigan law allows them, at least in these circumstances, I think, to reject where there is a dispute as to the PEG fee. I know that some of this argument is broader, that they might have rights to reject other situations, but the fact we have right now is when the dispute is over the PEG fee, does the city have to accept whatever PEG fee the cable operator is willing to pay out of the goodness of their hearts, or can they reject what the cable company is willing, out of the goodness of their hearts, to pay as a PEG fee? And they say the Michigan law has to be read as to allowing rejection under these circumstances, and to do so, it's consistent with federal law, there's no preemption, it makes the case a lot easier. What's wrong with that argument? What's wrong with that argument is, Your Honor, that we have to construe the Michigan Act under Michigan rules of construction, which are very clear that we take statutes as written, and in fact there are no saving constructions under Michigan law. The city of Lansing made that clear, the Court of Appeals there refused to adopt a saving construction. So you're saying that the city's stuck with the old franchise because you submitted your proposal for a new one on the last day. Your Honor, we're saying... And after that day expired, they couldn't impose a PEG fee, that's what you're saying. We are saying that any dispute about... Is that a reasonable construction of the statute, I suppose, is the issue. What the statute says is that uniform franchises, unless they're incomplete, shall be deemed approved. The problem with the district court's construction, and the reason why that is wrong, Your Honor, is that the district court inserted the words approve or reject into the Michigan Act, or it just rewrote it completely to say, well, as long as the city takes action... Am I correctly summarizing your position? Since you submitted your proposal on the last day, while the old franchise was still in effect, the city was effectively stuck with no PEG fee. Your Honor, what we did was we submitted a complete form, and what the Act does is it says by 30 days afterwards... How could they possibly... Did they have to act that day? Is that it? Your Honor, that statute says that the agreements are deemed approved 30 days afterwards if the city hasn't affirmatively approved it within that time period. The city has 30 days to discuss this with us, to put the matter out for public comment, but what the city can't do, and this is what the Michigan legislative history shows, is to try to extract more concessions from applicants. The city has a Section 13 process. I think this goes to some of your concerns. The statute in Section 13 says that cable providers in cities can come to negotiated agreements if that is truly voluntary on the part of the cable operator. The city could have initiated that proceeding with us, and they never did so, but where we're proceeding under Section 3, the whole point of what the Michigan legislature wanted to do, and this is not observed, is to say that the local franchise process has gotten cumbersome in Michigan. It has become a barrier to entry. It is hurting competition. It is hurting the willingness of providers to come to Michigan and provide services in this state. The legislative history says we, the Michigan legislature, have decided that franchises should be easy to obtain within a short period of time. That statute has worked pretty well. There are 1,500 uniform franchises in Michigan now, and a contrary ruling here, accepting the district court's interpretation of the statute, which is completely atextual, would throw all of those franchises into doubt. Michigan is not the only state that has done this, Your Honors. There are 22 other states that have adopted statewide... I'm getting past your argument that this is an existing franchise, and therefore the peg fee of the last one applies. If this were a new franchise, the Michigan Act would require that the standard franchise act form be used, would it not? Yes, that's correct. Assuming, just for sake of argument, that this is a new franchise, and that standard form has a blank as to the peg fee, what is your interpretation of how that works? That the cable company fills in that blank as to the peg fee, and the city has to accept it, or what? There's negotiation? How would that work under your scenario? Well, the way it normally works is that there is a blank for a franchise fee, and there's also a blank for the peg fee. We went ahead and wrote the zero in because we thought that's how the state law worked. The city disagreed. So you're saying that it works for zero peg fee, that's how it works? Well, again, Your Honor, because the old, our 1981... No, no, I'm saying just assume hypothetically this is a new franchise. Right. How do you say that peg fee blank is filled in? If there had never been a franchise in that city for cable service, the city would use the third blank and do a community needs assessment and determine on its own what the peg fee should be. Okay, so they would make a demand of up to 2%, and does the cable company have to accept that? Up to 2% based on a community needs assessment, that would apply. Okay, so that's approved then, whatever the city comes up with? As long as it's no more than 2%. But if there is a dispute about that, that should go to the state PUC under Section 10 of the Act. Okay, and under Judge Griffin's question, his hypothetical was, and you said assuming there had never been an agreement. So I want you to go back to Judge Grant's point and assume, another hypothetical, that this application is not submitted on the last day, but let's say it's submitted the day after, which is one day beyond the period, and you have those blanks. What happens then? Do you get to rely on the zero that you had in the other contract that's now expired, or that's beyond the date of enactment of the new statute, or do you have to do something else? Well, again, here's the rule under the Michigan Act. If there is an existing franchise agreement on, quote, on the effective date of this act, that has consequences for whether or not, you know, what the peg fee will be going forward. And no matter when we were submitted, whether it was the day before or the day after, there was a franchise for video services in Detroit that Comcast held on January 1, 2007. And again, the reason that makes sense is because what the statute did is it hit a reset button on franchises in Michigan, and it tried to true them all up to a uniform standard so there wouldn't be competitive disadvantages among video service providers. So if you look at Section 5 of the Act, it has these provisions in there that explain that if you have an old franchise, you can't renew it. If an old franchise has terms that are contrary to the new uniform terms, those are unreasonable and unenforceable. It has a lot of mechanisms to get everybody to a competitive level playing field, and it used the date of the act. And the city has never said that Comcast didn't have a franchise on January 1, 2007, so I don't think we should get confused about this. Nobody has ever said there wasn't an extant cable franchise agreement on the effective date of this act, which was January 1, 2007. There are no preemption problems, and that's how we got here in the first place, Your Honor, on our interlocutory appeal. I'd like to just address the city's suggestion that federal law, the Cable Act, somehow stands in the way of the state's ability to exercise its policy judgment in this way. The Cable Act was meant to promote competition and to remove burdensome franchising processes. Your opinion in Alliance for Community Media explained that well. The provisions that the city claims are preemptive of the Michigan Act are entirely permissive. The renewal provision of the federal act uses the word may. The modification provision of the federal act uses the word may. Congress never intended to disrupt the relationship between states and their political subdivisions, and it never meant to stop the states from doing an even better job in removing barriers to entry in the local franchising process. That's what Michigan did. Comcast happens to believe that that's good policy, but it doesn't matter whether it's good policy or not. What the state did was totally consistent with federal goals. The FCC has even pointed to Michigan's statute. It's a great example of a state providing more certainty and more uniformity in its franchise terms to help spur new entry. So to say that somehow Congress in the Federal Cable Act tied the hands of the states to do a better job within their borders in terms of creating a sensible franchise process turns the Federal Cable Act entirely on its head. Okay, you contend that the state rather than the city is the franchising authority. It seems to me that that's part of your argument under the Federal Cable Act, but doesn't the Cable Act expressly designate municipal governments as franchising authorities and only sometimes designates the state as the franchising authority, such as when a state agency approval is required to effectuate the franchise. And here, the municipality was really the central entity that was vested with that franchising authority. Isn't that correct? With respect, it's not, and for two reasons, Your Honor. The Federal Cable Act defines a franchising entity as whatever entity is empowered under federal, state, or local law to grant a franchise. So that definitional provision of the Cable Act explicitly leaves it up to whoever the state authority is to be giving out that job in a particular state. Here in Michigan, and this is the second part of my answer, cases like City of Niles, which is Michigan's Supreme Court precedent, make clear that ultimately this is the state's power. The state has delegated franchising power to municipalities in Section 29, but it comes back, and I'm sure the AG will address this. It's ultimately an exercise of the sovereign power of the state. So nothing in the Cable Act fixes municipalities as the franchising entity. It leaves it up for a state to distribute its power in that way as it sees fit, and Michigan law also supports that. One last issue on the preemption question. The Supreme Court's decision in Nixon makes clear that to the extent there's any concern here about federal preemption, it's the federal law that has to be interpreted narrowly so that federal courts don't interfere with the state's allocation of its own power. And if you thought there was any problem... If you're out of your principle time, you can use your rebuttal. I will. Thank you. Any further questions at this time for Ms. Walker? All right. Good morning. Good morning, Your Honors. Thank you. First... First of all, who are you? Well, I apologize. David Fink, appearing on behalf of the city of Detroit. Thank you. With me at council table is Isaac Sternheim from my office. Is the Attorney General here, too? The Attorney General is here. And I can't help but note that he's on the side of... I was hoping to see him on our side. All right. Maybe he's siding with Comcast now. I don't know. Well, as I said to the Attorney General when I saw him this morning, I have to agree with him. So... And there's a very important issue. I appreciated your supplemental brief because we were, you know, we were getting into preemption and everything else, and I think it helps narrow the focus here. And anyway, I also recognize that on appeal, you're the appellee, that sometimes, you know, the appellate often will withdraw issues on appeal and clarify positions, but I'm pleased that the appellee can do it as well, so thank you. Well, thank you, Your Honor. As we explained in the supplemental brief, when the new administration came in in the city of Detroit, they reviewed the case closely and realized that, aside from the fact that in some respects that position was a little incomprehensible, more importantly, we wanted to be clear what we really wanted to do. And Judge Lawson, the closer we get into this case, and I'm relatively new to it, but the closer we get into this case, the clearer it is that Judge Lawson really got his arms around it and really understood what was going on. He saw the problems, and he saw through some of our arguments, which, frankly, were a little obtuse and not necessary, quite frankly, because in the end, as the Court has already indicated, as Judge Griffin has indicated, in some respects the black-letter law is so something in the first day of contracts everybody learns that an unaccepted counteroffer is a rejection. And despite the fact that throughout their brief they talk about approval, approval, approval by the city of Detroit, and I won't waste time on that, the Court has noted, there is no such approval. It's a counteroffer, and it's a material term, because it's a lot of money, that 2%, right? That's correct. I was planning to discuss that, but that's correct. I do think that the... Let's stop right there. What about your opponent's argument that somehow this Michigan statute trumps that analysis and saddles you with the no-peg defeat because of the fact that that's the way it was in the previous contract? She says you're stuck with it. What do you say about that? Well, first of all, the record is not at all clear that that's the way it was in the previous contract. In the previous contract, there was a peg fee, but it was paid. It was not paid to the city of Detroit. It was to be paid to something called the Public Benefit Corporation, I think was the name of it, and I apologize. I should have the correct name for the court. But although it wasn't paid directly to the city as an entity, it was paid to another entity. Did they agree to continue that under this rule? No. No, they did not. They really want to have their cake and eat it at the same time. Okay. I mean, if their argument is that whatever peg fee was in the prior agreement is in the existing agreement, you're saying that that wasn't included in their standard form, huh? I'm sorry, that wasn't. No, that wasn't. Yes, that wasn't included in what they said. Yeah, they said zero in the form that they submitted. Okay. All right. They paid how much to this other entity? Well, I... What was the amount? Again, as I said, the record is not clear on it. I've been told that it could be as high as 3%. But... That wouldn't be allowed under the... Not under the new act. But what's really important in this process is Comcast wants to accept part but not all of how the statute works. The statute directs the commission... By the way, there were several references to, I think she said PEC. I assume she was referring to the Public Service Commission. And the statute requires the Public Service Commission to create the form, and they did. And the form that was created by the Public Service Commission had these blanks in it. But very significantly, and this is footnote 5 of our brief, we referenced an administrative case at the Public Service Commission. And in that case, the Michigan Public Service Commission said that PEG and franchise fee blanks are the responsibility of the franchising entity to complete. Comcast wasn't supposed to fill in that part of the franchise form at all. They were to submit the form to the city, and the city was to determine what to fill in there. Okay, so they weren't supposed to fill it in. The city was supposed to fill it in. Once Comcast filled it in with a zero, of course the city rejected that. And, pardon me, Comcast, once the city filled in the 2%, Comcast rejected that. So you had what constitutes really a rejection of a contract term. That all happened, but you all didn't bring suit until three years later. Why the gap? It seems like this all happened. The best answer is I have no idea. I really can't speak to it. So you don't know whether there were things going on with the Public Utility Commission, or you have no idea? Well, I do know that there was one thing. Initially, a matter was brought to the Public Service Commission by the city to try to enforce the corrected, if you will, franchise agreement, to try to enforce the 2% PEG fee. That pended at the Public Service Commission for a while and ultimately was dismissed by the Public Service Commission on a procedural basis. So after that dismissal, the case was brought in federal court. So I guess I did have an answer. I just couldn't recall at the moment. Judge Donald, you posed a very good question when you asked who the franchising entity is. And I have to say we certainly disagree with Comcast on this. The KBLAC does say in its definitions that a franchising entity means the local unit of government in which a provider offers video services through a franchise. And then, of course, the state constitution, I'm not going to spend a lot of time on that, but the state constitution is quite clear that the local unit of government has franchise authority. We can argue about how much authority that is, but we can't argue that there's no authority at all. And that's the position that they're trying to take, that this franchising entity is strictly an administerial function. And I actually want to take a moment to talk about something we don't discuss in our brief. It was when we were really looking closely at this statute that the absurdity of the position that Comcast takes becomes more clear. Getting back to Michigan rules of statutory construction, Ms. Walker is right, is she not, that the Michigan Supreme Court has actually held that statutes in Michigan can be interpreted to come to an absurd result if that's what the plain language dictates. I mean, that's contrary to federal statutory construction, but the Michigan Supreme Court has so held, have they not? Yes, but they start with the principle that you try to determine the actual intent. That's the primary goal of statutory construction, and to do so you look at the plain language. But in the federal system, if the plain language then leads to an absurd result, that is rejected. But in Michigan, if it leads to an absurd result, if that's consistent that the legislature intended, the absurd result holds, right? I have seen that. That's rather absurd too, but that's the way it is. I've seen that. Fortunately, that's not the only principle of statutory construction that we have, and among other things, we look to see if it can be interpreted in a way that doesn't violate the state constitution, which here becomes relevant. But there's another issue here, which in terms of the statutory construction, if we look at the language, there's no dispute that the city has 15 days to determine whether the application is complete. They've got 15 business days to determine if the application is complete. But the city has 30 days to approve. So the question is, what is the city supposed to be doing between the end of the 15 business days and the end of the 30 days? According to Comcast, nothing at all, because they would interpret that the statute says all the city can do is approve. They can either approve or do nothing, in which case approval applies. It is ministerial. But again, I'm sorry. To answer that, they're to make sure that the form is complete. But for the form to be complete, it needs the blanks to be filled in, and the blanks have to be agreed upon, don't they, by the parties? That's what they do, isn't it? Right, the application and the blanks in the application have to be complete. And agreed to. Yes. Ultimately, they certainly have to be agreed to to have a franchise. Absolutely. Otherwise, would it be whoever submits the form first wins? It's the submission of the form. It's whoever races to submit. I submitted the form first, and these are my figures. You must approve them, or you must accept them. I think that there is the implication, and it's not truly a race because, as Comcast would note, they get to go first. They get to apply. And they would suggest once they've applied, that must be accepted. And again, I ask, what happens between the 15 days for reviewing the application and the 30 days? There's absolutely nothing for the city to do based on their theory. There's absolutely nothing between the 15 days and the 30 days because we can't reject. We must accept if it's administratively complete. So the statute must, must mean that something other than approval can occur during that second 15 days. And I would argue that the only logical thing is the only logic in the statute. This isn't the only Michigan statute that has a provision that if something doesn't happen in a certain time period, it's deemed approved. There's a few of these in environmental law where the agency has a certain amount of time to act, and if they don't act in that time, there's automatic approval. But during the interim period, a rejection can occur, and that's the point here. It's interesting when you get right down to it. Comcast really does stand alone in this argument that they can ignore the 2% PEG fee. We can have no agreement on the 2% PEG fee, and they can just go about their business with the contract that they want. Obviously, we don't agree. The Attorney General has indicated in his brief that he doesn't agree. But what's actually most, and of course the amicus from the Michigan Municipal League, Michigan Contracts Association, and the State Bar, State Bar of Public Corporation section, all agree with our view. But what's most interesting is if you look at their two amicus parties, one, the Cable Association, sidesteps the issue, never talks about the 2%. AT&T in their amicus brief explicitly says that part of the grand compromise that leads to this statute includes two things, that the local community can impose a 5% franchise fee and a 2% PEG fee. There's no place in the AT&T brief that suggests that there shouldn't be a 2% PEG fee here. I think the court has caught, based on the questions that we've heard today, the real issue here. It's about the 2% PEG fee, and we can't make any sense of their position. I mean, yes, we have other issues that still have to be litigated below regarding the older contract, regarding the holdover. And yes, it's absolutely true that they're trying to have it both ways. They're trying to say they had an existing contract, and therefore they get the benefit of having an existing contract. But this isn't a renewal. They're applying for a brand new one at the absolute last minute, and then they claim that they have this entitlement. Mr. Fink, this is an interlocutory appeal, and Judge Lawson hasn't determined remedy or damages and so forth. But one of the issues is, under his ruling, he declares that Comstat is a trespasser as opposed to a holdover tenant. And neither you nor Comstat like that. But does it make any difference in Michigan law whether the cable company is deemed a trespasser as opposed to a holdover tenant? I mean, are the remedies, are the damages different under Michigan law? Does the term have any significance? There could be some significance, but I do have to say this. I don't think it's briefed extensively. I did see it was briefed. If we were going to do a more extensive supplemental brief, which we didn't think was appropriate, we might have gone to that issue a little bit, because in the end, the remedy phase is going to sort that out. There is a distinction, and here's the distinction. If we have the luxury of a choice that we can call them a holdover tenant or a trespasser, then we can go to the old contract and say, well, they had a lot of obligation to provide certain PEG services. They had agreed previously to do certain things, community services and other things like that. And arguably, we might be able to get something you can't impose from a trespass. But the truth is, the damages that apply in trespass are so significant, and it seems to me relatively insignificant whether we have the option or not to go with the holdover tenancy. I think the important thing is the ultimate remedy should be pretty much the same. They're operating a business in our city without our permission, despite the many, many, many times in the brief. The very beginning of the brief, they say we all agree that they're lawfully there. No, we don't. They would be lawfully there if they acknowledged it was a holdover. They would be lawfully if they bought the 2%. There's a lot of talk or evidence that they're not complying with the old agreement and the public service facilities they have are not consistent with what is required, that they're supposed to be in the city of Detroit throughout the suburbs, and they don't have the studios and the access to public service. Is that all taken care of by the PEG fee that the city wants now? Is that all subsumed in that, or is that separate? Well, going forward, the Michigan Act will limit our ability to require some of those specifics, probably. And going forward, the PEG fee probably subsumes that. Going backward, it doesn't, though, and that's in the case. Judge Lawson hasn't ruled on that, that that would be a remedy for the past violations. So that's really not before us, then, right? That's correct, Your Honor, and they haven't even had an opportunity to deny what we call the past violations. It's our allegation that they're past violations. Judge Griffin's question raises an interesting thought. Under Michigan law, is a trespasser barred from any equitable relief? Judge Lawson's going to have to struggle with that, I suspect. There have been an interesting series of cases, as the Court knows, involving the railroads, and really street railroads, the streetcars, going back to the turn of the last century. And there's fascinating questions about when they can be compelled to tear up the rails and not compelled to tear up the rails because it's not equitable. So there are very interesting equitable issues, and fashioning a remedy is not simple in this case. But, of course, for the city of Detroit, it's no secret that our primary interest right now is recovering whatever financial benefit the city is entitled to so that the city can provide the services it needs for its citizens, not just these peg services. All right. You say the dispute really is this 2% peg fee dispute. There was evidently an aborted attempt to mediate this before the Public Service Commission, which was unsuccessful. Have there been any efforts to mediate this dispute in our court? Not that I'm aware of, but to be fair, my appearance was just in the last two months. So I don't know if there was any mediation. Would it be helpful in view of the city to send this to mediate? I mean, we have a mediation office, and we've got good people. You not only have a mediation office, you have a mediation office that does a fantastic job. We've worked with them in multiple cases, and they're just fantastic. And I would never suggest for any client that we wouldn't want to work with your mediation office, but to be more specific, in this case, it doesn't make a lot of sense for this to drag out in litigation if there's a way to resolve it, and I agree completely. Thank you. Further questions? All right. Let's hear from the State of Michigan, or from Mr. Schutte, anyway, the Attorney General. Good evening, court. Spencer Statler, appearing on behalf of the Michigan Attorney General. The Michigan Attorney General has a slightly different take on whether or not there was a contract, in this case, or franchise. The contest is claiming that there was a franchise in effect by operation of law, and that it was 0% and included a 0% PEG fee because that was the fee that it included in the franchise proposal. The city, to my understanding, is claiming that there was no franchise agreement at all because it responded with a different PEG fee, and that different PEG fee was a critical term that operated as a denial. Or as a counteroffer. Counteroffer, yes. A counteroffer is a denial, right? Ordinarily. Ordinarily a counteroffer is a denial. And the way that it ordinarily works, though, is that Comcast submits a franchise proposal to the state without any PEG fee, and the Michigan Public Service Commission has held it. Before you go through that, though, if you could start and just tell me, from your vantage point, who has the franchising authority? Is it reposed solely in the state? Is it reposed in the municipalities, or is it just a delegable authority? That's critical, Your Honor. We agree with Comcast, which is why I was sitting with Comcast, that the state is the ultimate franchising authority. And I'll return to that. But just briefly, because I want to discuss it at length, but just briefly, the Attorney General believes that, so getting back to the process, ordinarily there would be no PEG fee in the uniform proposal, and the city's role, the Michigan Public Service Commission has held, to include a PEG fee in its acceptance. And so when the city accepted the uniform proposal with a 2% PEG fee, there was a franchise agreement in place. And you have to... There's no meeting of the minds. There's 0% and 2%, it's about $2 million difference, isn't it? Yes. Well, you have to read the uniform proposal as if there was no franchise, or no PEG fee included at all, because that's how it should work. How could you read it without, okay, it's 0% and it's 2%. I mean, what, do you read it as a fiction or something? Yes, because that's how it should work. It wasn't Comcast's role to place a PEG fee in the uniform proposal. And you said when the city accepted the agreement, what is it about these facts that constitutes an acceptance by the city of the 0%? I'm sorry, the city didn't accept the 0%. The city accepted it with a 2% PEG fee, and the city passed a resolution accepting the franchise agreement. So to return then... All right, that's your position. What do you base that on? Where does that come from? It's the process established in the Michigan Act. Well, no, the Michigan Act says you shall use the standardized franchise form, but it has blanks in it. And doesn't it presuppose that the parties have agreed to the blanks as opposed to the franchisor has to accept whatever figure the franchisee puts in the blanks? Well, the Michigan Public Service Commission has said, and its role to establish a uniform proposal, has said that the franchising entity is to put in the PEG fee. And that's why we think it was inappropriate for Comcast to insert a 0% in the PEG fee. So you're saying Comcast is stuck with the city's 2% instead of reverse. Oh, I'm sorry. I thought you were sitting with Comcast and agreeing with them on that. Well, we're an intervener in the case, and we have interests on both sides. I apologize, Your Honor. So you agree with the city that Comcast is stuck with the city's 2% PEG fee. Well, I wouldn't use the term stuck because Comcast has some options. They have options to dispute the PEG fee that the city included in the agreement that it accepted. It could go to the Michigan Public Service Commission and file a complaint, or, as it did in this case, it could simply refuse to pay and leave it to the city to file a complaint with the Michigan Public Service Commission. But the city gets to set the PEG fee, and then the other parties get to negotiate or to complain or to do something. But is it within the city's prerogative to establish the PEG fee up to that 2%? Yes. So you're saying there's a failure to exhaust administrative remedies that bars the city's claim here? Is that what you're saying? Is that your position today? Because I don't think it's in your brief. It's not in my brief. We decided instead to take the standing approach and argue that the city likes standing. But there certainly is an administrative remedy question. If it's not before me, it's not a question we rule on. I mean, the statement of issues in the case are stated in the briefs, particularly by the appellant. And we just don't deal with issues that are floating around that haven't been argued that haven't been briefed. So I don't see a failure to exhaust administrative remedies issue here. You throwing that in here at the last minute, I don't think it's helpful at all. And I wasn't raising the issue. You sure sounded like you were. Well, I was simply pointing out that the city has an administrative remedy if this court finds that there was a franchise agreement and that the PEC fee is set at 2%. Rather, I should say that the Comcast has an administrative remedy. So I'm not saying that's mandatory. Is it mandatory? No. Comcast could opt to simply pay the 2% that's in the agreement. It's a voluntary administrative remedy that nobody has to use and nobody has. Or at least it was aborted here in this case. That's correct. All right. Moving on to the issue of whether or not the state is the franchising authority, that's one of the two little issues I wanted to talk about. The first being the reason the state is here is to protect the relationship between the state as the franchising authority and the city as a local franchising entity. And the second being the exercise of the state's franchising authority by passage of the Michigan PEC. And to determine who's the franchising authority, it's necessary to look at the Cable Act first. And the Cable Act, as Comcast said, provides that either the state or local units of government can act as the franchising authority. So it's necessary to look at state law to determine who the franchising authority is. And Michigan precedent, which is binding on this court, is clear that the state, not the city, is the sovereign franchising authority. You can look at the City of Niles case in which it said that the grant of a franchise is an exercise of sovereign power vested in the legislature and of all it can delegate authority to municipalities, municipalities exercise that authority as the state's agent and subject to conditions imposed by law. And the state can't divest itself of this franchising authority as part of the state's police power and it can't be surrendered. And this provides context for us as we look at the Michigan Constitution and the Michigan Act. In the Michigan Constitution, for example, public utilities are prohibited from conducting business in municipalities without first obtaining a franchise. But in Article 7, Section 22, the state is permitted to impose conditions on municipalities' exercise of their authority in Article 7, Section 29. It says that municipalities can enact ordinances related to municipal concerns, but those ordinances must be subject to the Constitution and state law. And that's what the Michigan Act is in this case. It's delegating responsibilities to local franchising entities and imposing conditions on the exercise of that authority. And the state act is really intended to advance the purposes in the Federal Cable Act and encourages growth and development in the cable system and promotes competition. It's there to establish the orderly process of renewal and it protects against unfair denials. All right, counsel, how do you say the Michigan Act applies in this case? Does it provide an answer to this dispute? The Michigan Act provides procedures that we've talked about and provides that under those procedures, in this case, there was a franchise agreement as I already discussed. What were the terms of it? The terms were all the terms laid out in the Uniform Franchise Proposal and 2% PEG fee and 5% franchise fee. But I also want to address the modification provision in the Michigan Act because that's the only provision that didn't... And you're saying that under the Michigan Act, the franchise as approved by the city of Detroit is what would be in effect? Yes, that's correct. But again, the Comcast has the ability to challenge... What's wrong with Comcast's argument that they didn't do it right and that they're stuck with the no PEG fee? There's nothing wrong with Comcast's argument per se, but it's just that it shouldn't be raised in this particular venue. It should be raised in front of the Michigan Public Service Commission. And so to move on to the modification provision, I want to touch on that provision because it's the only provision that the district court validated. And it's a provision that we really don't need... shouldn't have been addressing at all because the city didn't have standing to challenge it. The city claims that it was harmed by the modification provision because it modified provisions in the old franchise agreement and that the city stopped providing services as a result. But if you look at the city's affidavits, any harm that it allegedly incurred was the result of the franchise agreement expiring, not the result of any modified provision because there was only a two-month period in which the old agreement was in effect. The Michigan Act was adopted in January of 2007 and it became effective then, and then the franchise expired approximately two months later. So it's just a two-month window that we're working with. But regardless of the length of time that elapsed, in this case where Comcast is asserting that the contract was in fact approved without the city's consent under the Act, isn't that an immediate injury in fact that would give the city standing? Because Comcast has included the zero PEC fees. They're saying, you know, you don't get to do anything about this, you don't get to modify, this is the contract. That is adverse to the city's position, so doesn't that create an immediate injury in fact that would give the city standing? Well, the city is the entity that's challenging the Michigan Act, not Comcast. And if anything, the party that would be injured by a two percent PEC fee would be Comcast because its position is that there is no PEC fee. But Comcast isn't challenging the Michigan Act. Comcast is asking this court to uphold the terms of the Michigan Act. And an issue I continually want to get back to that I haven't had a chance to is that... What I'm saying is that the contract that Comcast is asserting is approved denies the city of a stream of fees that would... And I understand that, and you're correct, that Comcast is the one appealing. And the city would have been deprived of those fees whether or not the Michigan Act had been passed or not because its franchise expired. And whether or not the Michigan Act was enacted, there's no reason to believe that it wouldn't have expired. And so it would have been deprived of those fees regardless of whether or not the Michigan Act was enacted. But moving on to the substance of the modification provision, it's not preempted because the Cable Act procedures are only triggered if a cable provider requests a modification, not in instances like this where the state has modified the agreement. And this is consistent with Congress' intent in passing the Cable Act because as it stated in the host report, it wasn't intended to interfere with the relationships that states have with their political subdivisions. I'm trying to decide how much I should get into the approval procedures because we've talked about those already extensively. I don't think it's necessary. Do you have any questions for the Attorney General? No. Thank you, Your Honor. I think we're all set. Mr. Fink, I know you wanted some time before, but I'll give you a couple of minutes if you think you need to respond to the Attorney General. Especially to the standing issue. Certainly with respect to the standing issue, but that would be the only thing. Thank you. I appreciate that very much. We're back to the issue of what happens to the prior, the 1985 contract. There's a reason it's called the 1985 contract because for, I haven't done the math, but for over 20 years, 22 years, they didn't negotiate a new contract. They were trying to, and they kept extending the contract. If the contract, there's no reason to believe that on February 28th, that that was the one contract they wouldn't extend. Of course they would have extended it. If the city doesn't have standing, because they, let me say it a different way, clearly the city has an injury, and the city has been arguing, even during those two months, that the contract wasn't enforced. Because the city makes an argument, they could say it's only two months, but standing is standing. It's injury in fact. The city had an injury in fact, and during those two months, they were precluded by the Michigan Act. I don't see any question, and I agree with the implications of Judge Donald's questions, it doesn't seem to me that it's a close question at all. The city clearly has standing. The Attorney General, who again, should really be sitting in the middle, because we do agree on half of these issues. But I think he misconstrued part of the question, talking about Comcast as being the party that should have standing. Yes, Comcast does have standing to object to the level of the peg fee, if you accept the Attorney General's argument that 2% applies. By the way, we do. So, but in terms of these other issues of the way that we are affected by the Michigan Act. Comcast hasn't been paying the peg fee yet. They have been refusing to, under the old adage. They haven't been paid. That's right, exactly. And we claim they should. They can say we were wrong, they can say, and they also have been providing various facilities, they have provided some links between the I-Net, the network among the government buildings, that's our position anyway. And how we can be precluded by this Michigan Act from bringing those, and then say we don't have standing to object to the Michigan Act. I mean, I know the case hasn't been tried, we could lose. But certainly, we should have standing under the Supreme Court jurisprudence. We certainly have standing. I appreciate the opportunity to speak. Anything further for Mr. Fink? All right. Ms. Walker, you've got ten minutes for rebuttal. Thank you, Your Honor. We are not here to dispute the applicability of the 2% peg fee. The city never alleged that in its complaint. That was the dispute seven years ago and at the state PUC, but the city then changed its mind and said, hey, let's go to federal court and challenge the entire act. So their complaint doesn't seek payment of the peg fee. What we're here to ask you to do with all respect is to reverse the district court's ruling that Comcast has no franchise at all and is trespassing. It sounds like the city now agrees that we have some kind of a uniform franchise and we think the record supports that. And, you know, if it includes a 2% peg fee, we are happy to go to mediation to talk about that, Your Honor, or we're happy to work that out at the state PUC. But the lawsuit that was brought in federal court was to take down the entire Michigan Act as somehow violative of federal law or state law, and we think that's wrong. So you're absolutely right. You guys have identified a dispute between us and the city about the applicability of the peg fee that preexisted this lawsuit. But again, there was a uniform franchise. It's the approved one. But irrespective of what the dispute was before, right now it looks like it's the 2% peg fee. So the dispute now in front of you in terms of reversing the district court's holding that Comcast has no franchise at all is whether there was a uniform franchise by operation of the Michigan Act. And we think that that, at the very least, is established on this summary judgment record. We don't lack any franchise at all, which is kind of where the district court, with all respect, went completely off the rails and found us to be a trespasser in a sua fonte ruling. It sounds like the city of Detroit would be happy to have you as the cable operator if you pay the 2% peg fee. You're telling me you would at least be willing to mediate that issue. We have always been willing to work that out at the state PUC, always. How about in this court? Would you be willing to do it in our mediation? Absolutely, Your Honor. We sure would. We sure would. And the key point, Your Honor, though, is that nobody ever said there was no franchise at all. And certainly nobody ever said there was no uniform franchise. Regardless of what has been said in the past, so you all can deal with those issues within the mediation environment. Right. And perhaps control your destinies in that context. We would be happy to do that at the court. I mean both sides. I'm not saying just one case. How long would the two sides need for mediation? The case is going to be submitted to us. And what happens is if we submit something to mediation, we put a deadline on it. And if it's not settled within a deadline, we'll issue a decision as to whatever issues were before us. So what do the parties need? Do you need 60 days, 90 days to mediate this? Or what would be appropriate? I'd like to confer with my client and possibly get back to the court. Okay. Could you get back to us within three days? Yes, Your Honor. Mr. Fink? Could you get back? Or do you know right now? 60 days, 90 days, either is fine. It would be fine with the City of Detroit? The City is on a pretty bad time flag in Washington State, especially on issues in the bottom line. All right. But, Your Honor. Are you willing to sit through the issue? Are you willing to sit through the issue? Okay. All right. 60 days is a good time frame to have them resolve the mediation. Excuse me. I sure wouldn't want to cut it too close. May I have my extra time, Your Honor? Sure. Yeah, you'll have all your time. Thank you. But why don't we do that? Why don't we tell them that we are closed and then they should tell us? I think we need to tell them. We need to let them know. Okay. I agree. Okay. You can have the rest of your rebuttal time, and I do want you to argue the issues because if the thing is not settled, we're going to decide it. The panel has decided that we will refer this case to the mediation office of the circuit court with a 60-day window, that the parties will be granted 60 days from today to settle the case through mediation. If we are not advised by the mediation office within 60 days, the case will proceed its normal course if it has been submitted. So the 60 days is what we'll do, and you'll be both contacted by the mediation office. But why don't you go ahead and argue the rest of your rebuttal in case the case doesn't settle? Understood. Thank you, Your Honor. Even as to mediation, though, there's an important point for Comcast. If we're able to settle the case, we still need reversal or a vacator of the district court's ruling that Comcast possesses no lawful franchise at all and is trespassing on city property. That, obviously, is why we're here. Again, we're happy to work out the PEG fee issue, but right now we are considered trespassers in the city of Detroit. But Judge Griffin didn't say, though, that this is referred to mediation just for the PEG fee. He said the case is referred to mediation. And all of the issues that you all are concerned about, discuss those with the mediator, and then the mediator, if you all come to some agreement, and there's something else left for us to do, then the mediator will delineate all of those and we'll consider them. Right. That's, of course, the real injury and why we're here. The remedy of trespass that the district court reached out and found entirely on its own is quite extreme, and there is a major difference between that and a holdover tenancy remedy, Your Honor. The city, in its remedial papers below, asked for the disgorgement of all profits that Comcast had earned since 2007 and asked for the court's assistance in the removal of all of Comcast equipment from the city. That is obviously quite radical of a remedy to even ask for, and that's what the city thought was made available under United Railway pursuant to the trespass ruling. And one important thing, again, as the case was litigated, it has kind of grown into something larger. The city never said that Comcast was a trespasser. The city itself said we were in a holdover tenancy because we were still operating pursuant to the 1985 franchise. The controversy before the district court was which franchise applied. It was never asserted by any party that Comcast had no franchise at all, and somehow the district court wound up at that result. We have explained in our briefs why we think we had some kind of a We had a franchise by operation of law under the Michigan Act, which with all respect is not about counteroffers and negotiation when a cable operator pursues the uniform franchise form. That's what the Michigan legislature was frankly trying to put an end to, was bargaining in the local franchise process, which had frankly gotten out of hand, and at least that was the legislature's opinion, and we respectfully submit that they were entitled to act on that for what they saw as a benefit of competition. When you inserted the zero in the fee thing, I think you were sort of inviting bargaining of the nature that you say that Michigan was trying to get rid of. Briefly, if I might, this is answered by the Michigan Act to Judge Graham's question. Section 6.8 says in addition to the fee required under subsection 1, which is the franchise fee, a video service provider shall pay a PEG fee, if there is an existing franchise on the effective date of this act, January 1, 2007, the fee paid to the franchising entity shall be X, and then at the expiration of that franchise agreement, you can have another amount, but if there is no existing franchise agreement, the percentage of gross revenues to be paid by a PEG fee not to exceed 2% may be determined by the city. So the city maintained that Section 6.8c was applicable. We maintained that A and B were applicable. What do you claim was the prior PEG fee? Well, Mr. Fink was right. It is zero because it wasn't paid to the city. It was paid to a public commission that had been established and which no longer exists. Okay, so that part of the statute that you would pay the prior PEG fee is like a non-starter because it's an impossibility, and therefore it simply doesn't apply because it cannot be done here. Well, Your Honor, it's just that the plain language of the act means that the result is that there's a zero PEG fee. How much money did you pay to this other entity that no longer exists? I don't recall, Your Honor. I'm not sure is the honest answer. If the prior agreement is in effect, and that's what you want to enforce, would you not be required to at least pay that amount? I mean, I assume that there was a public entity that was a surrogate for the city that was doing the public service functions that the city wants done, I guess. But by not agreeing to pay that money, you really haven't agreed to comply with the prior. We just have a different view than the city about what the plain language of the act. Well, you're saying because that entity doesn't exist, I don't have to pay anything anymore. Why? Under the prior. Because the statute says the fee paid to the franchising entity is what shall be the new fee. But again, this court need not decide that, and it's not really in dispute. The point is we have a uniform franchise. It may include a 2% fee if the city is right about state law. It may not if we're right, but we have a uniform franchise. We are not trespassers in the city of Detroit, and that radical ruling at the very least needs to be reversed. We also are operating at a bare minimum under the 1985 franchise agreement. Why? Because the Michigan Act has a provision in Section 5 that says if you are an incumbent provider, you can continue to operate under your former agreement until a new uniform one takes effect. So no matter what you think about the existence of a uniform franchise, and it sounds respectfully like you think there was one under the operation of the act, and perhaps it included a 2% fee, perhaps it didn't, but even if that were not the case, we could continue to operate by operation of the Michigan Act under the 1985 franchise. Comcast has been in the city doing, by the city's account, a great job, and to say that for the last seven years we've actually had no franchise at all when the city has explicitly approved our franchise in official documents, taken franchise fees, quote, pursuant to the uniform franchise agreement in its own letters, and issued proclamations like Comcast Cares Day, we think we've been there lawfully. Thank you, Ms. Walker. Do you have any further questions at this time? Thank you. The case will be referred to the mediation office for potential settlement with a 60-day deadline, and if not settled, the court will submit the case and render a decision. Thank you.